**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------x
ANDREW LINC KEIL,              :
                               :
         Plaintiff,            :
                               :          Civil Action No.
v.                             :          3:01CV865 (AWT)
                               :
FRED MARYANSKI,                :
ROBERT JEFFERS, GAY DOUGLAS,   :
MARGARET JABLONSKI,            :
JULANE LOVELACE,               :
MARTINE FRANCOIS, and          :
KEVIN CROWTHERS,               :
                               :
         Defendants.           :
------------------------------x
```

## RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, Andrew Linc Keil, brought this action against the following seven parties affiliated with the University of Connecticut: Interim Chancellor Fred Maryanski ("Maryanski"); professor and member of the Committee on Student Conduct ("CSC member") Robert Jeffers ("Jeffers"); Assistant Dean of Student Affairs Gay Douglas ("Douglas"); Interim Associate Vice Chancellor for Student Affairs and Dean of Students Margaret Jablonski ("Jablonski"); and students and CSC members Julane Lovelace ("Lovelace"), Martine Francois ("Francois"), and Kevin Crowthers ("Crowthers"). Defendants Maryanski, Douglas and Jablonski are sued in both their individual and official capacities. Defendants Jeffers, Lovelace, Francois and Crowthers are sued only in their individual capacities.

The plaintiff contends that the defendants deprived him of his Fourteenth Amendment constitutional rights to procedural and substantive due process and his right to equal protection of the law in violation of 42 U.S.C. § 1983.  The defendants have moved for summary judgment as to all of the plaintiff's claims.  For the reasons set forth below, the defendants' motion is being granted as to all the plaintiff's claims.

I.   **FACTUAL BACKGROUND**

Assessing the record in the light most favorable to the plaintiff, and drawing all reasonable inferences in his favor, the material facts for purposes of this motion are summarized below.  The court notes that while the defendants submitted affidavits of defendants Maryanski, Jeffers and Douglas and affidavits of Alissa Fenner Ferry, Mary A. Ives, James Montagna and Heidi Roberto, which included substantial supporting documentation (including admissions by the plaintiff), the plaintiff submitted nothing in opposition to the motion other than a memorandum of counsel and a statement of material facts (including a response to the defendants' statement) which contained no reference to evidentiary matters but rather simply repeated to a large degree the allegations in the complaint.

In August of 1999, the University of Connecticut hired the plaintiff, a Caucasian student, as a university residential assistant for the fourth floor of Windham Hall at the Storrs

campus of the University of Connecticut.  Alissa Fenner Ferry ("Ferry") was the Hall Director and the plaintiff's immediate supervisor.  Mary Ann Ives ("Ives") was the Complex Coordinator. Ives supervised Ferry.

On October 18, 1999, James Montagna ("the complainant"), a student residing on the fourth floor of Windham Hall, wrote an anonymous e-mail to Ferry.  The complainant informed Ferry that the plaintiff and his friends were subjecting the complainant to increasing harassment and intimidation, that they were creating a health hazard, and that they were endangering his safety and invading his privacy.

In particular, the complainant informed Ferry that the plaintiff kept a ferret under his bed and allowed it to run around the building, that he was condoning a serious garbage problem, that he and his friends were using drugs, that they were throwing water balloons out of the dorm windows, that the master keys had been stolen by the plaintiff's friends, that these friends refused to return the keys, and that this provided access to student dorm rooms.

On October 19, 1999, Ferry discussed the anonymous e-mail with Ives.  Ives and Ferry agreed that Ferry should respond to the complainant by e-mail to corroborate the information and encourage the complainant to come forward.  The complainant came forward and identified himself as the author of the e-mail.  He reluctantly discussed the fourth-floor situation with Ferry.

3

Ferry and Ives met with the plaintiff to discuss the allegations.  The plaintiff asked for a copy of the anonymous e-mail, which was given to him in exchange for his promise not to share it with anyone on the floor.  Ives feared that if the other residents of the floor saw the anonymous e-mail, it would incite them to act against the complainant and jeopardize his safety.

At that meeting, the plaintiff admitted to housing a ferret in his room, but he denied the other allegations.  Ferry advised the plaintiff that he was going to be terminated for violating the university's no-pet policy.  Ferry wrote the plaintiff a letter dated October 20, 1999 in which she formally terminated his employment as a resident assistant for violating the university no-pet policy.  She gave him until noon on October 27, 1999 to vacate the premises.

To preempt a negative reaction to the plaintiff's termination, Ferry held a meeting with the fourth-floor residents to discuss the situation.  The residents were agitated and hostile at the meeting.  They told Ferry that the plaintiff had given them copies of the anonymous e-mail.  They also stated that they knew who had written it.

Ferry told Ives that the floor residents had informed her that the plaintiff handed out the e-mail, and Ives left an angry voice-mail message asking the plaintiff to meet her the next morning to discuss the matter.  The next morning, Ferry received a message from the plaintiff indicating that he was not going to

meet with Ives and would be at Fenner's office to check out of
the dormitory at 12:30 p.m.

Prior to the plaintiff's departure, Ives and Ferry visited
the fourth-floor of the dormitory.  They found trash, graffiti
and harassing statements on the complainant's door.  Garbage was
piled high in front of the door to the complainant's room and
strewn everywhere, even in the floor's bathroom.  The words "You
really thought you would remain anonymous?" were written in
shaving cream on the door to the complainant's room.  (Ferry Aff.
Exh. D, p.5.)  On a wall, the words "D[epartment of]
R[esidential] L[ife] GO Fuck Yourselves" appeared.  (Id.)  On yet
another wall, the words "We Love Linc" were found.  (Id.)  A
certificate dated August 26, 1999, which the Department of
Residential Life had given to the plaintiff for completing his
training to be a residential assistant was taped to a bulletin
board.  The word "foundational" in the phrase "Bachelor of
Foundational Studies" on the certificate was circled, and an
arrow was pointing to the words "What does that mean?  Who do you
think you're kidding?"  (Montagna Aff. Exh. B, p.2.; id.)  Under
Ferry's name, someone drew an arrow pointing down to the word
"hypocrite."  (Id.)

The police were called to the scene.  They took a statement
from the complainant and wrote up an incident report.
Photographs were taken.

Ives, Ferry and the university police met with the plaintiff

5

to discuss what they had observed.  The plaintiff admitted that
he had shown the floor residents the anonymous e-mail and that he
had played Ives voice-mail message repeatedly to the floor
residents, but he denied inciting the other floor residents to
harass the complainant.

The fourth floor of the dormitory was badly damaged as a
result of the incidents that occurred.  "The University had to
replace light fixtures, a carpet, repair holes in the walls,
clean and re-paint the hallways . . . ."  (Ives Aff. ¶ 22.)

On October 26, 1999, the complainant filed a complaint
against the plaintiff with the Division of Student Affairs of the
Department of Residential Life.  He also provided a statement to
the university police.

Prior to filing his complaint, the complainant had been
exposed to extensive harassment and intimidation.  The
complainant stated that he and his roommate had been awakened by
the familiar voices of the plaintiff and his friends outside
their door making statements about getting even with him and
about masturbating, urinating and defecating on his door.  He had
heard someone spit on his door.  He had heard someone say
"Where's the HIV spray?"  (Montagna Aff. Exh. A, p.1.)  He had
heard them say that they wanted to force the door open and to
trash the bathrooms.

To prevent identification of the perpetrators, tape had been
placed over the peephole of the complainant's door on more than

6

one occasion.  At different times, the complainant had found
piles of garbage, shaving cream,  powder and the words "anonymous
no more" written or placed on or in front of his door.  (Ferry
Aff. Exh. E, p.2.)  He found a shower curtain, a pasty substance
and a condom stuck to his doorknob.

The complainant had also found taped to his door the flier
that Ferry had prepared to announce the fourth-floor residents'
meeting.  The words "Where were you. NARCS" were written at the
bottom.  (Montagna Aff. Exh. C.)  The complainant had found a
copy of the anonymous e-mail with the words "We Know!" written on
the bottom. (Id. Exh. B.)  The same e-mail had been posted in
approximately 25 other locations throughout the residence hall
and on residents' doors.

After the university investigated the October 26, 1999
complaint, defendant Douglas, Associate Dean of Students, wrote a
letter dated November 12, 1999 to the plaintiff charging him with
harassment and/or intimidation and disorderly conduct in
violation of the University of Connecticut Student Conduct Code
(Revised May 10, 1996)(the "Student Conduct Code").  Other
students also received notices of charges against them.

On December 2, 1999, defendant Douglas, as the Assistant
Dean of Students, held a pre-hearing interview with Keil.  Keil
and Douglas discussed the charges against him and his rights in
the upcoming hearing.  They discussed Keil's right to decline to
make statements, his right to an advisor or attorney of his

choice, his right to present witnesses and evidence, his right to be told the nature and content of the charges against him and his right to be given prior knowledge of any opposing evidence.  At his pre-hearing interview, Keil was given a copy of the Student Conduct Code and Keil was also advised about hearing procedures and scheduling.

On December 8, 1999, university officials held an evidentiary hearing.  The hearing panel was comprised of defendants Jeffers, Lovelace, Francois and Crowthers, who as the chair served in a non-voting capacity; Defendant Douglas presented the charges against the accused.  University regulations require that "two out of three of the hearing panelists" find that the accused is guilty by "clear and convincing evidence."  (Student Conduct Code, Sec. IX, No. 7, p.12.)

The hearing panel unanimously found the plaintiff guilty of the charges against him.  The Student Conduct Code defines "Harassment and/or Intimidation" as "conduct which threatens to cause physical harm to persons or damage to their property . . . ."  (Id., Sec. III, No. 5, p.4.)  The code defines "Disorderly Conduct" as "[c]onduct causing inconvenience and/or annoyance which includes any action which can reasonably be expected to disturb the academic pursuits or to interfere with or infringe upon the privacy, rights, privileges, health or safety of members

of the University community." (<u>Id.</u>, Sec. III, No. 6, p.4.)

At the hearing, the plaintiff admitted to housing the ferret in his dorm room, stating "I'm not saying I shouldn't have been fired.  That's perfectly legitimate." (Jeffers Aff. ¶ 11.)  The plaintiff admitted that both Ives and Ferry had asked him not to share the complainant's anonymous e-mail, but he said that he "didn't owe them anything" and that he "felt no need to respect their wishes." (<u>Id.</u>)

The plaintiff admitted that he had handed out copies of the anonymous e-mail and his training certificate to floor residents, that he had tape-recorded the angry voice-mail message Ives had left for him, that he had handed out copies to floor residents and also that he had played that recording repeatedly for others on the floor because at that point he "really didn't care." (<u>Id.</u> ¶ 12.)

At the hearing and in his affidavit submitted in support at the instant motion, the complainant unequivocally identified the plaintiff's voice as one he heard outside his door making plans with others to harass him.

"The evidence before the panel was that the students vandalized the building, placed trash in front of the victims' door, kicked the door and threatened the victims verbally, covering their peep hole so that no one could identify them visually." (Jeffers Aff. ¶ 14.)

Additionally, the panel found the accused students' stories

inconsistent.  At first they denied all of the charges.  Later
they admitted parts of the allegations.  They found the accused
students to be arrogant, apparently lacking in remorse for the
harassment.  They also found that the accused students attempted
to minimize the actions that they would admit to, such as writing
"anonymous no more", "we know", "faggot" and other offensive
graffiti on the victims' door.  (Id.)

In connection with his hearing, Keil was afforded all of the
rights given to any student who goes through the student judicial
process.  He was given the right to review and refute all of the
evidence.  He gave an opening statement, presented his own
testimony, questioned the accuser and presented character
witnesses in the form of exhibits.  Finally, he was given the
opportunity for summation.  Keil also had Attorney Eric
Rotthauser present at the portion of the hearing where sanctions
were determined.

On December 16, 1999, the panel agreed unanimously on the
appropriate punishment for the plaintiff.  He was suspended for
one semester.  The suspension was followed by disciplinary
probation until graduation.  The plaintiff was permanently
removed from the university residence halls, and he was required
to perform 300 hours of community service.

The plaintiff appealed the hearing panel's decision.  The
Student Conduct Code allows students to appeal disciplinary
decisions that involve suspension.  The first appeal is to the

"Vice President for Student Affairs," and that decision may be
appealed to "the Chancellor and Provost for University Affairs."
(Student Conduct Code, Sec. X, p.14-15.)  The Student Conduct
Code does not provide for further review.

The plaintiff's appeal of the December 16, 1999 decision was
denied by the Vice Chancellor of Student Affairs, Vicky Triponey,
in a letter dated January 12, 2000.  She noted that the plaintiff
neither claimed an error in the hearing procedure nor claimed
that there was new evidence or information material to the case
that had not been available at the time of the hearing as
required by Section X of the Student Conduct Code and Article
VIII, B.3.e of the University By-Laws.

The plaintiff then appealed the Vice Chancellor's decision
to the Interim Chancellor.  On January 24, 2000, the plaintiff,
his parents and their attorney met with the Interim Chancellor,
defendant Maryanski, and the university's counsel.  The plaintiff
and his parents were asked to offer any information they felt
might be pertinent to the judicial proceedings.  The plaintiff
admits that defendant Maryanski listened to all of their
comments.

In a letter dated January 26, 2000, the Interim Chancellor
denied the plaintiff's appeal.  After reviewing the record, the
plaintiff's statements and the parents' comments, he concluded
that the plaintiff had offered no persuasive evidence that the
hearing panel made any procedural errors, that the plaintiff had

11

been given a full and fair opportunity to present his case and
that the sanction administered was appropriate.

Even though the Interim Chancellor found no reason to alter
the sanction, he agreed to stay the effective date of the
plaintiff's suspension for one semester to allow the plaintiff to
complete an already scheduled internship and plan for the
completion of his academic career.

Finally, the plaintiff attempted to appeal the Interim
Chancellor's decision.  In a letter dated March 5, 2000, the
plaintiff asked defendant Jablonski, Interim Associate Vice
Chancellor, to reconsider the Interim Chancellor's decision, but
the Student Conduct Code does not provide for such consideration.

## II.  <u>LEGAL STANDARD</u>

A motion for summary judgment may not be granted unless the
court determines that there is no genuine issue of material fact
to be tried and that the facts as to which there is no such issue
warrant judgment for the moving party as a matter of law.  Fed.
R. Civ. P. 56(c).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,
322-23 (1986); <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d
1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry of
summary judgment . . . against a party who fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will bear
the burden of proof at trial."  <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at

322.

When ruling on a motion for summary judgment, the court must respect the province of the jury.  The court, therefore, may not try issues of fact.  <u>See</u>, <u>e.g.</u>, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Donahue v. Windsor Locks Board of Fire Comm'rs</u>, 834 F.2d 54, 58 (2d Cir. 1987); <u>Heyman v. Commerce & Indus. Ins. Co.</u>, 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."  <u>Anderson</u>, 477 U.S. at 255.  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution."  <u>Gallo</u>, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is <u>both</u> genuine <u>and</u> related to a material fact. Therefore, the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248 (internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248.  As the Court observed in <u>Anderson</u>:

13

"[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."  Id. at 248.  Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted.  When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses.  Immaterial or minor facts will not prevent summary judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor."  Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)(quoting Del. & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).  Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence.  "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment.  Stern v. Trs. of Columbia Univ., 131 F.3d 305, 315 (2d

14

Cir. 1997) (quoting W. World Ins. Co. v. Stack Oil, Inc., 922
F.2d 118, 121 (2d Cir. 1990)).  Moreover, the "mere existence of
a scintilla of evidence in support of the [nonmovant's] position"
will be insufficient; there must be evidence on which a jury
could "reasonably find" for the nonmovant.  Anderson, 477 U.S. at
252.

Finally, the nonmoving party cannot simply rest on the
allegations in its pleadings since the essence of summary
judgment is to go beyond the pleadings to determine if a genuine
issue of material fact exists.  See Celotex Corp., 477 U.S. at
324.  "Although the moving party bears the initial burden of
establishing that there are no genuine issues of material fact,"
Weinstock, 224 F.3d at 41, if the movant demonstrates an absence
of such issues, a limited burden of production shifts to the
nonmovant, which must "demonstrate more than some metaphysical
doubt as to the material facts, . . . [and] must come forward
with specific facts showing that there is a genuine issue for
trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072
(2d Cir. 1993)(quotation marks, citations and emphasis omitted).
Furthermore, "unsupported allegations do not create a material
issue of fact." Weinstock, 224 F.3d at 41.  If the nonmovant
fails to meet this burden, summary judgment should be granted.

## III.  DISCUSSION

### A.    Insufficiency of Service of Process[1]

#### _____ (1). *Jablonski, Crowthers and Lovelace*

Counsel for the defendants has not filed an appearance on behalf of Jablonski, Crowthers and Lovelace, but he notes that the record reflects that they have never been served and no request for an extension of time in which to complete service has ever been made.  This is not disputed by the plaintiff.

A court may not exercise personal jurisdiction over a defendant until the procedural requirement of service of the summons has been satisfied.  See Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 104 (1987).  Thus, the case must be dismissed as to Jablonski, Crowthers and Lovelace.

#### (2). *Douglas*

Defendant Douglas was sued in both her individual and official capacities.  She has presented evidence that even though she had actual notice of the lawsuit, the plaintiff never served her in her individual capacity, either by actual hand delivery or by service at her usual place of abode.  This is not disputed by the plaintiff.

Rule 4(e)(1) of the Federal Rules of Civil Procedure states

---

[1] The court notes that the discussion below makes it apparent that the record in this case clearly establishes that the defendants who were not served would be entitled to summary judgment on all the plaintiff's claims if they had been properly served.

that "service upon an individual from whom a waiver has not been
obtained and filed . . . may be effected in any judicial district
of the United States . . . pursuant to the law of the state in
which the district court is located . . . ."  Fed. R. Civ. P.
4(e)(1).  Section 52-57(a) of the Connecticut General Statutes
states that, for service upon individuals, "process in any civil
action shall be served by leaving a true and attested copy of it,
including the declaration or complaint, with the defendant, or at
his [or her] usual place of abode . . . ."  Conn. Gen. Stat. §
52-57(a)(1999).

Defendant Douglas has not waived service of process.  She
preserved her right to challenge the plaintiff's failure to
properly serve her by including this defense in her answer.
Accordingly, the case must be dismissed as to Douglas in her
individual capacity.  However, because the defendants' papers do
not address the issue of insufficiency of service of process as
to the claims against Douglas in her official capacity, those
claims are not being dismissed on that basis.

   B.   **Procedural Due Process**

The defendants have moved for summary judgment as to the
plaintiff's claim that the defendants violated his Fourteenth
Amendment constitutional right to procedural due process.  First,
the plaintiff argues that the defendants gave him 24-hours notice
to vacate his dormitory room after he had previously been

notified by letter that he would be given a week.  Second, the plaintiff argues that clear and convincing evidence to justify the plaintiff's suspension was not presented at the hearing. Third, the plaintiff argues that the defendants continue to refuse to consider "any of the plaintiff's pleas for an appeal." (See Doc. No. 18 at 7.)  Each of these arguments is without merit.

The plaintiff argues that the defendants initially notified him by means of the letter dated October 20, 1999 that he would be given until October 27, 1999 to vacate his dormitory room, but subsequently changed their minds and gave him 24 hours notice to vacate the premises.  However, "unsupported allegations do not create a material issue of fact." Weinstock v. Columbia Univ., 244 F.3d 33, 41 (2d Cir. 2000).  The party moving for summary judgment bears the initial burden of establishing that there are no genuine issues of material fact.  See Weinstock, 224 F.3d at 41.  If the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who "must come forward with specific facts showing that there is a genuine issue for trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)(quotation marks, citations and emphasis omitted).

The plaintiff submits no evidence in support of this assertion, and the evidence submitted by the defendants indicates only that the plaintiff told Ferry that he was not going to meet

18

with Ives in response to her message and would be moving out.
The court notes that even the plaintiff's Complaint does not
allege that after the defendants gave the plaintiff one-week's
notice to vacate, any defendant told the plaintiff to vacate his
residence within 24 hours, prior to the October 27, 1999
deadline.  Paragraph 14 of the Complaint alleges that the
plaintiff was "given one week to vacate his room and find another
place to live."  (Compl. ¶ 14.)

Second, the plaintiff argues that clear and convincing
evidence to justify the plaintiff's suspension was not presented
at the hearing.  He contends that he was suspended based on
unsupported evidence from a single student complainant, despite
evidence that the plaintiff was not involved in the harassment.

The plaintiff's memorandum states that the defendant's
position that the complainant heard the plaintiff's voice is not
supported by the complainant's affidavit.  This is simply
incorrect.  The complainant's affidavit not only makes it clear
that he heard the plaintiff plotting with others to harass him
but also that he testified to that effect at the hearing.

Moreover, in addition to the complainant's affidavit and
corresponding testimony at the hearing that he unequivocally
identified the plaintiff's voice outside his door in the early
morning hours of October 20, 1999 making plans with other
students to harass him, the CSC members had before them the
plaintiff's own admission that he shared the anonymous e-mail

19

written by the complainant with the rest of his floor, despite the fact that both Ives and Ferry asked him not to share the complainant's e-mail to protect the complainant and his roommate from further harassment.  The plaintiff also admitted handing out copies of Ives' tape-recorded angry voice-mail message to him and repeatedly playing it to others on his floor, and he admitted that he provided floor residents with his training certificate.

Furthermore, the only evidence shows that the CSC members weighed all of the evidence presented at the hearing, including evidence that favored the plaintiff, that they made credibility assessments, and that they then unanimously found that the evidence of the plaintiff's guilt was clear and convincing.  The plaintiff fails to create a genuine issue as to this point.

Third, the plaintiff argues that the defendants refused to consider "any of the plaintiff's pleas for an appeal."  The Student Conduct Code allows students to appeal disciplinary decisions that involve suspension.  The first appeal is to the Vice President for Student Affairs, who in this case appears to be the Vice Chancellor, and the second appeal is to the Chancellor.

However, the record shows that the plaintiff appealed the December 16, 1999 written decision of the hearing panel and that appeal was denied by the Vice Chancellor.  The record reflects that the plaintiff appealed the Vice Chancellor's decision to the Interim Chancellor.  The plaintiff admits that the plaintiff and

his parents met with the Interim Chancellor, defendant Maryanski, their attorney and the university counsel and that the plaintiff and his parents were asked to offer any information they felt might be pertinent to the judicial proceedings.  The plaintiff further admits that defendant Maryanski listened to all of their comments.  However, the Interim Chancellor denied the plaintiff's appeal.

In a letter dated March 5, 2000, the plaintiff attempted to appeal the Interim Chancellor's decision to defendant Jablonski, Associate Vice Chancellor, but the Student Conduct Code contains no provision allowing a student to seek such review.  Thus, the record shows that the plaintiff was allowed to appeal twice, but that after consideration, his appeals were denied, and that the third appeal he attempted to take is not provided for by the Student Conduct Code.

Accordingly, summary judgment should be granted as to all three of the plaintiff's due process arguments because the plaintiff's unsupported assertions do not suffice to create a genuine issue of fact and the record reflects that the plaintiff received procedural due process.

C.   **Substantive Due Process**

To state a substantive due process claim, the plaintiff must allege egregious conduct "which goes beyond merely offending some fastidious squeamishness or private sentimentalism and can fairly be viewed as so brutal and offensive to human dignity as to shock

the conscience. . . . and is so brutal and offensive that it does
not comport with traditional ideas of fair play and decency
. . . ." Smith v. Half Hollow Hills Cent. Sch. Dist., 298 F.3d
168, 173 (2d Cir. 2002)(internal citations and quotation marks
omitted).

As discussed above, the defendants have presented evidence
that demonstrates that the sanctions imposed upon the plaintiff
were based on clear and convincing evidence of the plaintiff's
guilt.  Particularly in light of the plaintiff's admission that
he circulated the complainant's anonymous e-mail despite
admonitions not to do so, that he repeatedly played the tape of
the telephone message from Ives to the other students on the
floor, the student complainant's testimony at the hearing that he
unequivocally identified the plaintiff's voice outside his room
on October 20, 1999 making plans with other students to further
harass him, and the evidence of escalating vandalism, the
plaintiff's situation is far removed from meeting the standard of
"shocking the conscience." Compare County of Sacramento v.
Lewis, 523 U.S. 833, 1716-21 (1998)(rejecting substantive due
process claim where high-speed police chase with no intent to
harm suspect physically or to worsen legal plight resulted in
death), and DeLeon v. Little, 981 F. Supp. 728, 734-36 (D. Conn.
1997)(rejecting substantive due process claim where supervisor's
cruel and abusive treatment of employee did not "shock the
conscience"), with Rochin v. California, 342 U.S. 165, 172-73

(1952)(finding violation of substantive due process where
officer, who had information that accused had been selling
narcotics, directed hospital staff to forcibly pump victim's
stomach and that produced two capsules containing morphine for
prosecution purposes), and Johnson v. Newburgh Enlarged Sch.
Dist., 239 F.3d 246, 249, 252 (2d Cir. 2001)(finding gym
teacher's vicious physical attack upon a student who threw a ball
near him violated the student's substantive due process right to
be free of excessive force).

     In addition, the defendants are entitled to judgment on the
plaintiff's substantive due process claim because, as his
complaint makes clear, the protection he seeks is afforded by the
equal protection clause, so his substantive due process claim
must be dismissed.  "Where a particular Amendment 'provides an
explicit textual source of constitutional protection' against
a particular sort of government behavior, 'that Amendment, not
the more generalized notion of 'substantive due process,' must be
the guide for analyzing these claims.'"  Albright v. Oliver, 510
U.S. 266, 273 (1994) quoting Graham v. Connor, 490 U.S. 386, 395,
n.6 (1989).  See also Tenenbaum v. Williams, 193 F.3d 581, 600
(2d Cir. 1999).

     Accordingly, the defendants summary judgment motion should
be granted as to the substantive due process claim.

23

D.   **Equal Protection Claim**

The plaintiff argues that the hearing panel's decision violated the plaintiff's right to equal protection of the law because it was intentionally and maliciously arbitrary, capricious, wholly irrational and unsupported by any findings of fact or evidence.

To state a claim for the violation of the right to equal protection under the law, the plaintiff must allege the following:

> (1) he, compared with others similarly situated, was selectively treated; and (2) . . . such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

Silberberg v. Lynberg, 186 F. Supp. 2d 157, 169 (D. Conn. 2002). The plaintiff is Caucasian, and the Supreme Court has recognized that there can be an equal protection violation in a "class of one" case.  To state a class-of-one claim, the plaintiff must allege that he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

Although paragraphs 24 and 28 of the Complaint allege that the defendants engaged in intentional, irrational actions based on impermissible considerations such as malicious or bad faith intention to injure the plaintiff, the plaintiff has produced no

24

evidence in support of those contentions; nor has he produced any evidence that he was intentionally or selectively treated differently from others similarly situated.  On the other hand, the defendants have produced evidence that shows the plaintiff's case was handled pursuant to all of the procedures set forth in the Student Conduct Code, in other words, that he was treated just like others who are similarly situated.

Accordingly, the defendants' summary judgment motion should be granted as to the equal protection claim.

### E.   **Qualified Immunity**

The defendants also argue they are entitled to summary judgment pursuant to the doctrine of qualified immunity as to all of the plaintiff's claims.  Because the court has concluded, for the reasons stated below, that there are no genuine issues of material fact and the undisputed facts show that the defendants did not violate any constitutional right of the plaintiff, the court does not need to reach the issue of qualified immunity.

### IV.  CONCLUSION

For the reasons stated above, the defendants' Motion for Summary Judgment (Doc. #13) is hereby GRANTED.

The Clerk shall close this case.

It is so ordered.

Dated this 20th day of June, 2005, at Hartford, Connecticut.

/s/AWT

_____
            Alvin W. Thompson
      United States District Judge